IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:14CV529

CONTINENTAL CASUALTY COMPANY,          )
                                       )
     Plaintiff,               )
                                       )
vs.                                    )                    ORDER
                                       )
AMERISURE INSURANCE COMPANY,           )
                                       )
     Defendant.               )
_____)

     This matter is before the Court upon Plaintiff Continental Casualty Company's

("Continental") Motion for Summary Judgment (Doc. No. 33), Defendant Amerisure Insurance

Company's ("Amerisure") Motion for Summary Judgment (Doc. No. 31), as well as

Continental's Motion to Strike (Doc. No. 43) and Motion *in Limine* (Doc. No. 34).  All motions

have been fully briefed and are ripe for disposition.

## I.    FACTUAL BACKGROUND

     The facts in this case are largely undisputed. This is an insurance coverage action arising

out of serious injuries to an employee of a subcontractor that occurred during the construction of

a project owned by Charlotte Mecklenburg Hospital Authority ("CMHA") in Pineville, North

Carolina.  The general contractor on the project, KBR Building Group, LLC ("BE&K"), entered

into a subcontract with SteelFab, Inc. ("SteelFab") to supply and erect the structural steel

infrastructure for the project.  SteelFab, in turn, subcontracted with Carolina Steel and Stone, Inc.

("CSS") for the erection of structural steel.  On December 14, 2010, an employee of CSS, Dustin

Miller, fell from steel decking and suffered serious injuries.

In addition to instituting a workers' compensation action against CSS, Miller filed a personal injury action against SteelFab and BE&K ("the *Miller* suit"). Specifically, the *Miller* suit alleged that Miller was working for CSS, a subcontractor of SteelFab and that while working for CSS and pursuant to CSS's subcontract with SteelFab, he was injured. He asserts that actions or omissions by BE&K, SteelFab, and CSS contributed to his injuries, including *inter alia* allegations that CSS did not provide adequate safety protections and that BE&K and SteelFab failed to provide and failed to require CSS to provide such protections to CSS employees.

**A. The Insurance Policies:**

At the time of the accident, CSS held commercial general liability ("CGL") and umbrella insurance policies issued by Amerisure, as required by the CSS-SteelFab subcontract. SteelFab and BE&K were additional insureds under both the Amerisure policies. The CGL Policy provided limits of liability of $1,000,000 per occurrence and the Umbrella Policy provided limits of $5 million per occurrence. SteelFab held policies issued by Continental, and BE&K was an additional insured under the Continental policies. The Continental CGL Policy also provided for a $1,000,000 per occurrence limit.

The Amerisure policy contains standard insurance industry forms which include, *inter alia,* the following language:

> Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations…
> The word "insured" means any person or organization qualifying as such under Section II – Who Is An Insured….

(Doc. No. 5-2, p. 16 of 30).

With respect to the duty to defend and the duty to indemnify, the Amerisure Policy states:

**SECTION I. COVERAGES**
**COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILTY**

    1.      Insuring Agreement

        a.  We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" … to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages….

(Id. at p. 3, ¶ 22).

The Amerisure policies also contained an exclusion (the "CIP exclusion") which provided as follows:

This insurance does not apply to "bodily injury" or "property damage" arising out of either your ongoing operations or operations included within the "products-completed operations hazard" if such operations were at any time included within a "controlled insurance program" for a construction project which you are or were involved.

(Doc. No. 5-3, p. 31; Doc. No. 5-5, p. 29).

The policy defined "controlled insurance program" as:

a construction, erection or demolition project for which the prime contractor/ project manager or owner of the construction project has secured general liability insurance covering some or all of the contractor subcontractors involved in the project, otherwise referred to as an Owner Controlled Insurance Program (O.C.I.P.) or Contractor Controlled Insurance Program. (C.C.I.P.).

(Doc. No. 1-5, p. 93).

After construction had begun on the project, CMHA opted to implement a rolling owner controlled insurance program ("ROCIP") on the project.[1]  In connection with the ROCIP, CMHA obtained General Liability and Workers Compensation policies of insurance from Zurich American Insurance Company ("Zurich").  BE&K was enrolled in the ROCIP and insured under the Zurich policy. SteelFab was not enrolled, nor was CSS.  In late December 2010, after Mr.

---

[1] The terms "CIP," "ROCIP," and "OCIP" are used interchangeably in this Order.

Miller's injury, Amerisure inquired of Zurich whether CSS was insured under any insurance policies issued by Zurich per the ROCIP procured by CMHA. Zurich informed Amerisure by letter dated December 23, 2010 that CSS was not enrolled in the ROCIP and thus was not insured under the Zurich ROCIP insurance. Therefore, Amerisure knew that CSS was not covered under the ROCIP.

Moreover, prior to the present dispute, during an audit of premium, Amerisure's auditor asked CSS to provide any documentation regarding any operations covered by an OCIP. Amerisure's practice was to exclude from its premium calculations payroll for its named insured's operations covered by an OCIP, resulting in lower premiums. In other words, the insured pays no premium to Amerisure for payroll on operations covered by an OCIP.

In order to take advantage of a lower premium, the named insured had to provide documentation proving its operations were covered by an OCIP. The December 2011 audit report reflects that Amerisure required CSS to provide documentary proof in the form of OCIP insurance policies, certificates of insurance showing CSS covered by OCIP insurance or payroll reports submitted to any CIP carrier, showing which of CSS's operations, if any, were covered by an OCIP. CSS did not provide to Amerisure any documentation showing CSS's operations were covered by any OCIP during the May 2010 to May 2011 period when Miller was injured.

Because CSS provided no documentation proving that any of its operations were, according to Amerisure, "OCIP projects" or "OCIP jobs covered elsewhere," Amerisure calculated the final premium (i.e. price) charged to CSS for CGL insurance provided under the Amerisure policies based on CSS' payroll on all of CSS' operations, including

CSS's operations on the CMHA project per the SteelFab-CSS subcontract. In other words, Amerisure charged CSS and CSS paid premium for insurance coverage, including coverage for additional insureds, based on the exposures presented by all of CSS's operations between May 30, 2010 to May 30, 2011, including CSS's operations on the CMHA project when Miller was injured.

## B. The *Miller* Suit

When SteelFab and BE&K were sued by Miller, Continental, on their behalf, tendered defense and indemnity of the *Miller* suit to CSS and Amerisure. More than three months after the tender, Amerisure responded by letter May 22, 2013 denying any duty to defend or indemnify SteelFab and BE&K. Amerisure admitted that SteelFab and BE&K are additional insured's under the Amerisure policy pursuant to the terms of the contract and policy provisions. Despite this admission, Amerisure rejected the tender, stating that the policies' CIP exclusion, contained in both the CGL and umbrella policies, applied to preclude coverage. Continental was compelled to step in and provide defense and indemnity coverage to BE&K and SteelFab. Continental paid $660,700 in legal fees and costs to defend SteelFab and BE&K, and ultimately settled the *Miller* suit for $1.7 million subject to rights to obtain indemnification and/or contribution from Amerisure.

## C. The Present Litigation

Continental brought this declaratory judgment action seeking a judicial determination that Amerisure had a duty under the Amerisure policy to defend SteelFab and BE&K in the *Miller* suit. Continental also seeks a declaration that the Amerisure policy is primary and non-contributing, and that Continental is entitled to reimbursement of all attorney's fees and expenses incurred in connection with the defense in the *Miller* suit. Amerisure has counterclaimed for a

declaratory judgment that Amerisure has no obligation to defend BE&K or SteelFab in the *Miller* suit or to reimburse Continental for its costs incurred in defending that litigation.

## II.    DISCUSSION

### A.  Standard of Review for Summary Judgment

Summary judgment is appropriate in those cases in which there is no genuine dispute as to a material fact, and in which it appears that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Summary judgment should be granted in those cases "in which it is perfectly clear that no genuine issue of material fact remains unresolved and inquiry into the facts is unnecessary to clarify the application of the law." *Haavistola v. Comty. Fire Co. of Rising Sun, Inc.*, 6 F.3d 211, 214 (4th Cir. 1993). "[W]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate." *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 119 (4th Cir. 1991).

### B.  North Carolina Law Governing Interpretation of Insurance Contracts

Under North Carolina law, it is well established that the interpretation of an insurance policy is a question of law for the court to decide. *See, e.g., Wachovia Bank & Trust Co. v. Westchester Fire Ins. Co.*, 172 S.E.2d 518, 522 (N.C. 1970). A term in an insurance policy is considered to be either "clear and unambiguous," in which case "the court must enforce the contract of insurance as it is written," or "ambiguous and reasonably susceptible to more than one interpretation," in which case "the policy must be construed in favor of coverage and against the insurer." *North Carolina Farm Bureau Mut. Ins. Co. v. Mizell*, 530 S.E.2d 93, 95 (N.C. Ct. App. 2000).

Finally, when a term is defined in an insurance policy "the definition will be applied to all clauses of the contract…unless it is made inapplicable by the express language of the contract, or is inconsistent with…the coverage under consideration." *Kirk v. Nationwide Mut. Ins. Co.*, 119 S.E.2d 645, 647-48 (N.C. 1961). Undefined, nontechnical words are ascribed "a meaning consistent with the sense in which they are used in ordinary speech, unless the context clearly requires otherwise." *Harleysville Mut. Ins. Co. v. Buzz Off Insect Shield, L.L.C.*, 692 S.E.2d 605, 612 (N.C. 2010) ("*Harleysville*") (quoting *Wachovia Bank & Tr. Co. v. Westchester Fire Ins. Co.*, 172 S.E.2d 518, 522 (N.C. 1970)). Where "the meaning of words or the effect of provisions is uncertain or capable of several reasonable interpretations, the doubts will be resolved…in favor of the policyholder." *Gaston Cnty Dyeing Mach. Co. v. Northfield Ins. Co.*, 524 S.E.2d 558, 563 (N.C. 2000) ("Gaston Cnty Dyeing"), *see also Harleysville*, 692 S.E.2d at 612.

## C. The Duty to Defend

The North Carolina Supreme Court has observed that "the insurer's duty to defend the insured is broader than its obligation to pay damages incurred by events covered by a particular policy." *Waste Mgmt. of Carolinas, Inc. v. Peerless Ins. Co.*, 340 S.E.2d 374, 377 (N.C. 1986) ("*Waste Mgmt.*"). The duty to defend is determined at the time tender is made to the insurer by the "comparison test," which compares the terms of the policy with the facts as alleged in the underlying complaint, which are presumed true. *Harleysville*, 692 S.E.2d at 610 (quoting *Waste Mgmt.*, 340 S.E.2d at 378); *St. Paul Fire & Marine Ins. Co. v. Vigilant Ins. Co.*, 919 F.2d 235, 239 (4th Cir. 1990) ("*Vigilant*"). An insurer must defend its insured against a lawsuit unless no allegation is "even arguably covered by the policy." *Vigilant*, 919 F.2d at 240. The "mere possibility" of coverage requires the insurer to defend the entire lawsuit. *Waste Mgmt.*, 340

S.E.2d at 377, n. 2; *Pulte Home Corp. v. American S. Ins. Co.*, 647 S.E.2d 614, 620 (N.C. Ct. App. 2007) ("*Pulte*"); *Bruce-Terminix Co. v. Zurich Ins. Co.*, 504 S.E.2d 574, 578 (N.C. Ct. App. 1998). Any doubt as to coverage is to be resolved in favor of the insured. *Pulte*, 647 S.E.2d at 620.

Moreover, the duty to defend exists "[w]here the insurer knows or could reasonably ascertain facts that, if proven, would be covered by its policy." *Waste Mgmt*., 340 S.E.2d at 377. The insurer therefore has a "duty to investigate and evaluate facts expressed or implied in the third-party complaint as well as facts learned from the insured and other sources." *Id.* at 378.

"If the claim is within the coverage of the policy, the insurer's refusal to defend is unjustified even if it is based upon an honest but mistaken belief that the claim is not covered." *Duke Univ. v. St. Paul Fire and Marine Ins. Co*., 386 S.E.2d 762, 764 (N.C. Ct. App. 1990); *see also, Builders Mut. Ins. Co. v. Mitchell*, 709 S.E.2d 528, 534-35 (N.C. Ct. App. 2011). In addition, "[u]nder North Carolina law, if an insurer improperly refuses to defend a claim, it is estopped from denying coverage and must pay any reasonable settlement—even if it made an honest mistake in its denial." *In re Abrams & Abrams, P.A.*, 605 F.3d 238, 241 (4th Cir. 2010); *see Jamestown Mut. Ins. Co. v. Nationwide Mut. Ins. Co.*, 176 S.E.2d 751 (N.C. 1970) ("It is well settled that an insurer who wrongfully refuses to defend a suit against its insured is liable to the insured for sums expended in payment or settlement of the claim, for reasonable attorneys' fees, and for other expenses of defending the suit.").

Amerisure's briefs conspicuously fail to adequately address the central issue in this case: whether it had a duty to defend its insureds based upon the complaint filed in the *Miller* suit. Applying North Carolina law, Amerisure owed a duty to defend SteelFab and BE&K if any of

the allegations in the *Miller* complaint arguably fell within the coverage afforded to them by operation of the additional insured endorsement.

In the suit filed against SteelFab and BE&K, Miller asserts facts potentially within Amerisure's coverage.[2] Specifically, he asserts injury during the policy period caused by an occurrence. Here, the *Miller* complaint alleged that Miller was working for CSS, a subcontractor of SteelFab and that while working for CSS and pursuant to CSS' subcontract with SteelFab, he was injured. He asserts that actions or omissions by BE&K, SteelFab and CSS contributed to his injuries, including *inter alia* allegations that CSS did not provide adequate safety protections and that BE&K and SteelFab failed to provide and failed to require CSS to provide such protections to CSS employees.

Amerisure admits that SteelFab and BE&K were additional insureds under the Amerisure policies, but contends that the plain language of the CIP exclusion applied to exclude coverage. Amerisure argues that if there was a bodily injury "arising out of" CSS's operations which were included in a CIP, the exclusion applies. Although Amerisure concedes that CSS was not *enrolled* in the CIP, it argues that CSS was *eligible to be enrolled* and *should have* been enrolled in the CIP. Further, it contends that the CIP exclusion applies not only to CSS but to the additional insureds, BE&K and SteelFab, because the injury arose out of CSS's operations covered by a CIP.

While there may be an issue of fact as to whether CSS was eligible to be enrolled and should have been enrolled in the CIP, Amerisure's position nevertheless fails for several reasons. First of all, under North Carolina law, the applicability of any exclusion must be apparent from the allegations of the pleadings alone; an insurer cannot rely on evidence outside the four corners

---

[2] The *Miller* complaint is attached as Exhibit 1 to the Complaint.

of the pleadings to deny a defense. *See Vigilant*, 724 F. Supp. 1173, 1176 (M.D.N.C. 1989), *aff'd* 919 F.2d 235, 239 (4th Cir. 1990) (holding that "in North Carolina, an insurer properly determines whether it has a duty to defend by applying what is generally known as the 'comparison test.' Under that analysis, only two documents are pertinent: the insurance policy and the complaint."). In *Vigilant*, the court made clear that an insurer may look to facts collateral to the allegations against the policyholder to *confirm* a defense obligation, but not to *negate* one. *Id*. at 1179. (" The duty of an insurer to defend…is excused only if the facts alleged in the complaint do not even arguably fall within the policy coverage and an independent investigation reveals no extrinsic facts demonstrating coverage.").

Thus, Amerisure must show at a minimum that the *Miller* complaint alleges that CSS's operations were included in the CMHA ROCIP. The *Miller* complaint makes no mention of insurance let alone any "controlled insurance program." When a complaint is silent regarding facts necessary to negate a duty to defend, North Carolina courts have held the insurer must defend the suit. *See*, *e.g.*, *Harleysville Mut. Ins. Co. v. Hartford Cas. Ins. Co.*, 90 F. Supp. 3d 526, 549 (E.D.N.C. 2015) (Insurer could not escape duty to defend based on exclusion where complaint did not allege when water intrusion started or when deterioration to all buildings had commenced); *see also Nationwide Prop. & Cas. Ins. Co. v. Brinley's Grading Serv., Inc.*, 737 S.E.2d 192 (N.C. Ct. App. 2013) (insurer cannot rely on "facts" not alleged in complaint to deny a defense) ("*Brinley's*"); *Imperial Cas. and Indem. Co. v. Radiator Specialty Co.*, 862 F. Supp. 1437, 1440-41 (E.D.N.C. 1994), *aff'd* 67 F.3d 534 (4th Cir. 1995) (court held insurer had duty to defend where complaint was silent as to whether injury occurred during policy period); *Vigilant*, 724 F. Supp. at 1177-79 (finding insurer had duty to defend under occurrence-based policy expiring prior to May 1, 1976 when complaint generally alleged injury in 1976).

Moreover, Amerisure's argument that a complaint can be construed to "suggest" or imply facts to bring the claim within an exclusion where the complaint fails to expressly allege specific facts establishing application of the exclusion is contrary to North Carolina law.  In *Universal Ins. Co. v. Burton Farm* Dev. Co., 718 S.E.2d 665 (N.C. Ct. App. 2011), an insurer denied a duty to defend an additional insured based on an exclusion barring coverage for "injury arising out of 'supervision ... done by or for you on a project on which you serve as a construction manager.'" 718 S.E.2d at 671. Although the underlying complaint referred to the named insured as a "project manager," it did not make any reference to a "construction manager." *Id.* The court found that the insurer had not met its burden of showing that the "construction manager" exclusion applied to preclude a duty to defend the additional insured in connection with acts by its project manager.  *Id.*  As the *Miller* complaint is silent as to any CIP, Amerisure cannot establish an element of its CIP Exclusion based on the allegations of the complaint.

Moreover, Amerisure cannot rely on evidence outside the *Miller* complaint to establish applicability of an exclusion to deny a defense. *See Vigilant*, 724 F. Supp. at 1179 ("Once a complaint implicates the possibility of coverage, an insurer may not exonerate itself by preliminarily determining that no coverage actually exists despite the allegations of the complaint."); *see also Peace Coll. of Raleigh, Inc. v. Am. Int'l Specialty Lines Ins. Co.*, 5:09-CV-479-FL, 2010 WL 3743539 (E.D.N.C. Sept. 16, 2010).  In *Brinley's*, the insurer relied on information outside the complaint to show that an employee was a "leased" employee such that a policy exclusion applied. The court held that the "facts" relied on by the insurer were "beside the point" and not pertinent to the determination of whether the insurer had a duty to defend. It held that the insurer had "failed to show that the allegations of the underlying complaint are 'not even

arguably covered by the policy.'" *Brinley's*, 737 S.E.2d 192 (quoting *Waste Mgmt.*, 340 S.E.2d at 378).

Similarly, this court has recognized that an insurer may not rely on facts outside the pleadings to establish application of an exclusion:

> Permitting evidence outside the pleadings to negate allegations in the complaint is akin to a perfunctory review of the merits of the underlying claims against the insured. Such review is not consistent with the duty to defend as understood by the insured party and as explained by North Carolina law pertaining to the interpretation of contracts for insurance.

*New NGC, Inc. v. Ace Am. Ins. Co.*, No. 3:10-CV-00022-RLV, 2015 WL 2259172, at *12 (W.D.N.C. May 13, 2015).

Here, Amerisure improperly attempts to rely on information outside the *Miller* complaint to support its assertion that CSS's operations "must have been" included in the CMHA ROCIP. Amerisure surmises that mere eligibility for enrollment should mean that CSS should be included in the ROCIP. Undeterred by the fallacy of its argument, Amerisure asserts, without any evidentiary support, that CSS' operations "must have been included" in the ROCIP because the ROCIP manual did not specifically identify steel erectors as an "ineligible" contractor. This argument is unavailing and flatly refuted by the evidence. The undisputed evidence establishes that a contractor who was not enrolled in the ROCIP was not included in the ROCIP, and CSS was not enrolled. Not only was CSS not enrolled in the CIP, but Amerisure was undoubtedly aware of this fact at the time of tender.

The allegations of the *Miller* complaint arguably allege injuries arising out of the acts or omissions of Amerisure's additional insureds and plainly triggered Amerisure's duty to defend. By denying a defense without justification, Amerisure breached its duty to defend. North Carolina law holds that, as a result, Amerisure has relinquished any right to assert any defense to

coverage and that it is liable for the costs of defense and settlement paid on behalf of its insureds, SteelFab and BE&K. *Vigilant*, 919 F.2d at 240. Upon tender of the defense in the *Miller* suit, Amerisure had three options: (1) seek a declaratory judgment regarding its obligations before or pending trial of the underlying action, (2) defend the insured under a reservation of rights, or (3) refuse either to defend or to seek a declaratory judgment at the risk that it might later be found to have breached its duty to defend. *See Vigilant*, 724 F. Supp. at 1180. Amerisure chose option number three. It must now bear the consequences of that choice under North Carolina law.

Although it is unnecessary to the Court's decision, the Court will briefly address Amerisure's interpretation of its CIP exclusion to bar coverage whenever CSS's operations are included in a construction project where an owner or contractor had a controlled insurance program for a project *regardless of whether CSS was insured*. This interpretation is contrived and renders its coverage meaningless. The cases cited by Amerisure do not persuade this Court otherwise. Under Amerisure's interpretation, the CIP exclusion would bar coverage in almost all circumstances for CSS and its upper-tier contractors which CSS is required to add as additional insureds and defend and indemnify per its contract. Even though Amerisure collects premium from CSS for such jobs because it considers such jobs to be non-CIP jobs if CSS is not insured under the CIP, CSS is left without protection for itself and its upper-tier contractors. The plain meaning of the word "included" in the context of the exclusion, must mean "covered."

Amerisure also argues for an interpretation of the CIP exclusion that would exclude coverage for any additional insured so long as the injury arose out of CSS's operations. This interpretation is likewise not supported by the plain language of the exclusion. As previously noted, the exclusion states:

> This insurance does not apply to "bodily injury" or "property damage" arising out of either *your* ongoing operations or operations included within the "products-

13

completed operations hazard" if such operations were at any time included within a "controlled insurance program" for a construction project which you are or were involved.  (emphasis added)

Amerisure agrees with Continental's argument that "your" means the Named Insured, CSS, but takes the position that the exclusion bars coverage for any additional insured where the injury arose out of CSS's operations.  Amerisure argues that the injury to Miller clearly arose out of CSS's operations.

If Amerisure had intended the exclusion to apply to the additional insureds, it could have easily drafted the provision to say so.  *See Penske Truck Leasing Co., Ltd. P'ship v. Republic W. Ins. Co*., 407 F. Supp. 2d 741, 751 (E.D.N.C. 2006) (stating: "[t]he fact that [the insurer] could have drafted its policy to include the language "any insured" together with the fact that it chose not to do so further support the court's interpretation of the language at issue.").  In *Penske*, the court considered whether an exclusion in a policy providing that insurance coverage does not apply to "bodily injury . . . arising out of your work after that work has been completed or abandoned" applied to an additional insured. The court found that the term "your work" could only apply to the operations of the named insured.  The exclusion's use of the term injury arising out of the named insured's work means it applies only to a claim against the named insured and does not apply to a claim against an additional insured.

Reading the word "your" as referring only to the operations of CSS, as the plain language of the exclusion demands, the relevant portions of the exclusion can only be interpreted as follows: "This insurance does not apply to "bodily injury"  . . . arising out of [CSS's] ongoing operations . . . if [CSS's] operations were at any time included within a "controlled insurance program."

Most importantly, the CIP exclusion is Amerisure's proprietary exclusion, meaning it was drafted by Amerisure. Accordingly, to the extent there is any ambiguity or uncertainty in the language it must be construed against Amerisure, the drafter, and in favor of coverage. *See Harleysville*, 692 S.E.2d at 612; *Gaston Cnty Dyeing,* 524 S.E.2d at 563 (where "the meaning of words or the effect of provisions is uncertain or capable of several reasonable interpretations, the doubts will be resolved…in favor of [coverage]."); *New NGC, Inc.*, 105 F. Supp. 3d at 560.

### D.     The Umbrella Policy

Amerisure contends that even if its policies did provide coverage, that coverage is limited to $1,000,000, the limits of its CGL. Amerisure argues that its Umbrella Policy is excess to Continental's primary policy and therefore, the Continental CGL policy would apply once Amerisure's CGL limits were exhausted.

The CSS-SteelFab subcontract required CSS to procure both CGL and umbrella insurance. (Doc. No. 35-5; Doc. 1-3, pp. 4-5, 21-22). The subcontract required $1,000,000 in CGL coverage and $1,000,000 in excess or umbrella coverage. *Id*. In addition, the subcontract provided that:

> 15.5 **PRIMARY COVERAGE**. The insurance required of Subcontractor must be primary and non-contributory with SteelFab's Insurance program.

(Doc. No. 1-3, p. 21). In addition, the Insurance Requirements attached to the subcontract state that "[a]ll insurance required shall be primary and non-contributory to any other insurance of SteelFab, [and BE&K] . . .." (Doc. No. 35-5). The Amerisure Certificate of Insurance issued to CSS states that "[c]overage is written on a primary basis." (Doc. No. 35-6, p. 3). Indeed, Amerisure's corporate 30(b)(6) designee, Paul Richards, admitted in his deposition that to the extent that coverage is available to SteelFab and BE&K, it is primary and non-contributory.

(Doc. No. 35-15, pp. 41, 52). Moreover, it is undisputed that SteelFab and BE&K were

additional insureds on the Amerisure CGL policy and that the Amerisure umbrella provided that:

> Any additional insured under any policy of "underlying insurance" will automatically be an insured under this insurance.
>
> If coverage provided to the additional insured is required by contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance required by the contract, less any amounts payable by the "underlying insurance."

(Doc. No. 5-4, p. 27). [3]

Despite the clear language of the subcontract and the umbrella policy itself, Amerisure

argues that the "other insurance" clause in its umbrella policy should be construed such that its

policy attaches excess of Continental's CGL policy based on a general rule providing for

exhaustion of all primary insurance before excess insurance. The Amerisure Umbrella Policy

contains an "Other Insurance" provision which provides:

> "This insurance is excess over, and shall not contribute with any of the other insurance, whether primary, excess, contingent or on any other basis."

(Doc. No. 5-4, p. 12).

The "Other Insurance" provision in the Continental CGL Policy provides as follows:

> 4. Other Insurance
> If other valid and collectible insurance is available to the insured for a loss we cover under coverages A or B of this Coverage Part, our obligations are limited as follows:
>
> a.    Primary Insurance
> This insurance is primary except when paragraph b. below applies. If this insurance is primary, our obligations are not affected unless any of the

---

[3] "Underlying insurance" is defined in the policy to mean "any policies of insurance listed in the Declarations under the Schedule of "underlying insurance." The Schedule of Underlying Insurance lists the Amerisure CGL Policy as the only general liability insurance. (Doc. No. 5-4, p. 5).

other insurance is also primary. Then, we will share with all that other insurance by the method described in Paragraph c. below.

b.      Excess Insurance
(1)     This insurance is excess over:

. . .

(b) Any other *primary* insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured by attachment of an endorsement. (emphasis added).

(Doc. No. 1-9, p. 14).[4]

According to the language of these "other insurance" clauses, Amerisure contends that its umbrella policy would be excess to the Continental primary policy, and thus would only kick in after the limits of that policy have been exhausted. It appears to the Court that the language of the other insurances clauses would operate to render the Amerisure umbrella policy excess over the Continental primary policy. However, the Fourth Circuit has held that a contractual agreement between the insureds can shift the entire loss to a particular insurer notwithstanding the existence of other insurance clauses. *See St. Paul Fire & Marine Ins. Co. v. American International Specialty Lines Ins. Co.*, 365 F.3d 263 (4th Cir. 2004) (interpreting Virginia law and holding that the general rule is that an indemnity agreement between the insureds shifts the entire loss to a particular insurer notwithstanding the existence of other insurance clauses). Indeed, a majority of jurisdictions to have addressed priority of insurance coverage disputes involving additional insureds have held that the downstream/subcontractor's insurance, including its excess insurance, should pay first and before the contractor's own primary insurance. *See*

---

[4] The Court had previously requested that the parties brief this issue with regard to the "Other Insurance" clause contained in one of the endorsements to the Continental CGL policy. The parties have now adequately explained to the Court why such provision is inapplicable.

*Wal-Mart Stores, Inc. v. RLI Ins. Co.*, 292 F.3d 583 (8th Cir. 2002) (holding that excess policy issued to downstream contractor and covering upstream contractor as additional insured was liable before upstream contractor's own insurance); *Am. Indem. Lloyds v. Travelers Prop. & Cas. Ins. Co.*, 335 F.3d 429, 436 (5th Cir. 2003) (holding that subcontractor's primary and excess insurance policies must pay first and before contractor's own insurance); *Star Ins. Co. v. Continental Resources, Inc.*, 89 F.Supp.3d 1015, 1028 (D.N.D. 2015) (primary and excess liability policies issued to subcontractor and covering additional insured must respond first before additional insured's own coverage); *West Bend Mut. Ins. Co. v. MacDougall Pierce Constr., Inc. Amerisure Ins. Co.*, 11 N.E.3d 531 (Indiana Ct. App. 2014) (same); *Employers Ins. Co. of Wausau v. Nat'l Union Fire Ins. Co.*, No. 8:07-cv-1099-T-30EAJ, 2008 WL 1777807 (Apr. 18, 2008, M.D. Fla.); *Hertz Equip. Rental Corp. v. Ammon Painting Co.*, No. WD 70191, 2009 WL 2365578 (Aug. 4, 2009, Missouri App. Ct.) (same); *Cont'l Cas. Co. v. City of South Daytona*, 807 So.2d 91, 92 (Fla. 5th DCA 2002) (affirming the trial court's determination that, because of the indemnification agreement, "any claims which arose from the use of the City's facilities were to be *primarily and exclusively* covered by the insurance provided by the [indemnitor]") (emphasis added). In each of these cases, the courts declined to follow labels of "primary" or "excess" or apply general rules regarding such labels. Instead, the courts reasoned that because the parties bargained in their contracts for the downstream contractor's insurance to pay first, priority of coverage was governed by such contractual provisions rather than "other insurance" clauses.

While it appears that North Carolina courts have yet to address this issue, the Court predicts that North Carolina will follow the majority of jurisdictions and hold that the subcontract between the insureds, CSS and SteelFab, governs the determination of which

insurance should pay first. SteelFab expressly contracted with CSS to require CSS to procure no less than $2 million of primary and umbrella insurance for the benefit of SteelFab and BE&K. The Subcontract expressly required that such insurance must be primary to and without contribution from SteelFab's own insurance. A certificate of insurance was issued to SteelFab representing that the coverage afforded by Amerisure was "written on a primary basis." That certificate of insurance also reflected the intent that coverage under all Amerisure policies listed on June 2010 certificate of insurance is "primary." (Doc. No. 35-6, p.3) SteelFab is entitled to the benefit of its bargain that the primary and umbrella insurance procured by CSS from Amerisure respond first before SteelFab's own insurance. Because the CSS-SteelFab subcontract evidences the intent of the parties, that language dictates the priority of coverage.[5] Accordingly, the Court finds that the Amerisure umbrella policy kicks in to provide coverage after the Amerisure CGL is exhausted.

### E. Prejudgment Interest and Attorney's Fees

Continental contends that it is entitled to prejudgment interest and attorney's fees. Federal courts applying North Carolina law have recognized the right of a defending insurer to prejudgment interest on a contribution claim against a non-defending insurer. *Vigilant*, 919 F.2d at 243 (awarding prejudgment interest to defending insurer granted judgment on contribution claim against non-defending insurer).

---

[5] Continental also argues that an indemnity provision in the CSS-SteelFab subcontract shifts the entire loss to Amerisure. However, Amerisure contends that the indemnity provision is invalid under North Carolina law pursuant to N.C. Gen. Stat. § 22B-1 and thus cannot serve to shift the entire loss to Amerisure. As the plain language of the subcontract and the umbrella policy shifts the entire loss to Amerisure, as discussed above, the Court finds it unnecessary to address the validity of the indemnity provision.
.

Citing *Fireman's Fund Ins. Co. v. North Carolina Farm Bureau Mut. Ins. Co.*, 152 S.E.2d 513 (N.C. 1967) ("Fireman's Fund"), Amerisure argues that Continental is not entitled to attorney's fees incurred in the *Miller* suit because Continental had its own separate and distinct obligation to defend SteelFab and BE&K under its CGL policy. In *Fireman's Fund,* the court held that an insurer who has a duty to defend its insured may not recover its defense costs, *under a theory of equitable subrogation*, from another insurer who also has a duty to defend the insured. *Nationwide Mut. Ins. Co. v. State Farm Mut. Ins. Co.*, 470 S.E.2d 556, 559 (1996). However, Continental may proceed by way of contribution to recover Amerisure's share of the defense costs. *See Id.*; *see also Medical Mut. Ins. Co. of N.C. v. American Cas. Co. of Reading, P.A.*, 721 F.Supp.2d 447, 464 (E.D.N.C. 2010) (requiring defendant insurer who had a duty to defend to share equally in defense costs). Both Amerisure and Continental had a duty to defend SteelFab and BE&K. Equity dictates that the defense costs be shared equally among the two insurers. *See Ames v. Continental Cas. Co.*, 340 S.E.2d 479, 486 (N.C. Ct. App. 1986); *see also Vigilant*, 919 F.2d at 241 (relying on *Ames* and ruling that once an insurer is shown to have breached its duty to defend, the remedy of the breach is that it should share equally in the costs of defending the insured).

### F. Motion to Strike and Motion *in Limine*

Continental has moved pursuant to Rule 12(f) to strike Defendant's Exhibits 1 through 6 and the testimony of Walter E. Brock, Jr. submitted with Amerisure's Motion for Summary Judgment. The Court has reviewed the filings of the parties and finds that the testimony of Mr. Brock should be stricken. Mr. Brock's opinion contained in his Expert Report is nothing other than his interpretation of the CIP exclusion. "It is typically improper for a court to rely on expert

testimony for purposes of interpreting the terms and clauses of a contract." *America Online, Inc. v. St. Paul Merc. Inc. Co.*, 207 F.Supp.2d 459, 466 n.1 (E.D. Va. 2002), *aff'd* 347 F.3d 89 (4th Cir. 2003). The Court will deny the Motion to Strike as to the remaining exhibits, as the Court found it unnecessary to rely on these exhibits in reaching its decision herein. The Motion *in Limine* is rendered moot by this decision.

IT IS THEREFORE ORDERED THAT:

(1) Continental's Motion for Summary Judgment is GRANTED IN PART AND DENIED IN PART. Continental is entitled to judgment against Amerisure in the amount of $1,700,000, plus prejudgment interest at the applicable legal rate, and Amerisure must pay one-half the cost of the *Miller* defense, plus prejudgment interest at the applicable legal rate from the date of Continental's payments of those amounts through the date of entry of this Order;

(2) Amerisure's Motion for Summary Judgment is DENIED;

(3) Continental's Motion to Strike is GRANTED IN PART AND DENIED IN PART; and,

(4) Continental's Motion *in Limine* is DENIED AS MOOT.

Signed: January 3, 2017

Graham C. Mullen
United States District Judge